1  Ruchell Cinque Magee
   3A5-142  #A92051
2  Box 3461, CSP
   Corcoran,  CA  93212
3



FILED

08 AUG 21 PM 1:34

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8          U.S. DISTRICT COURT FOR THE

9          NORTHERN DISTRICT CALIFORNIA

10  Ruchell Cinque Magee,          )
                                   )      CV 08   3445 JF
11          Plaintiff              )
                                   )
12  vs-                            )      MOTION FOR EMERGENCE
                                   )      RESTRAINING ORDER
13  Peter Flores, Jr., attorney    )      PENDING CIVIL ACTION
                                   )
14  Thelton E. Henderson, judge;   )
                                   )
15  Board Of Prison Parole.        )
                                   )
16  ===============================

17          TO:   THE RESPECTABLE JUDGE PRESIDING.

18          Now  into Court, Ruchell Cinque Magee, plaintiff

19  and moves for Emergence restraining Order, pending civil

20  action in this matter.

21          That, on August 8, 2008, the defendants Flores and

22  Herderson,  joined by three (3) other agents whose identies

23  are unknown at time of this writing, did, with malice and

24  willfully intents, carry out stagged kangaroo court at

25  Corcoran state prison, in a room with the plaintiff used

26

27

28                              1

1 as their target for persecution.

2    At all times herein mentioned, the defendants and

3 others acting in participation with defendants have

4 connived, schemed and plotted to subject the plaintiff

5 to wrongful death.

6    At  all times herein mentioned, defendant Henderson

7 acted under guise of federal law.

8    At all times herein mentioned, defendant Flores and

9 his kangaroo court agents August 8, 2008, acted under

10 color of California State authority or law.

11                    JURISDICTION

12    This court have jurisdiction pursuant to

13 28 U.S.C.  §  1331,  2284 and Federal Rules Of Civil

14 Procedure (Rule 65 ).

15                    CASE FACTS
                      --------

16

17    On August 8, 2008, the plaintiff was taking before

18 kangaroo court at Corcoran state prison and labelled

19 threat to the public by use of false information recycled

20 from DOUBLE JEOPARDY PROSECUTION in the case of jury acquittal.

21    There exist no law written which justify tampering

22 with jury acquittal.

23    There exist no law written, justify public officials

24 acceptance of bribes to coverup hate crime frameups.

25    Plaintiff is a Black Man, and hated by white

26 extremist, and obvious, the mental ill negroes who accept

27 slave conditions as ways of life based on mental illness.

28

1    Acting in excess of its authority, on January 16, 2008,

2    defendant Henderson accepted $10,000.00 from the Los

3    Angeles District Attorney and unknown representatives of

4    the California Attorney General Office in agreement to

5    deny the plaintiff, at all cost, opportunity to be heard

6    regarding the suppression of the Los Angeles County trial

7    court records (Case Number 272227. ).

8

9    The Los Angeles trial court records have been

10   suppressed and kept under gag rule, since May 1963, and

11   July 1965, to hide prosecutor's jury tampering by use of

12   officers of the court's knowingly and deliberately false

13   guilty/insanity pleads tricked upon the jurors who was

14   underminded to believe those false pleads was the

15   plaintiff's admission of guilt.

16       Evidence showing the plaintiff has served forty seven

17   (47 ) years in prison, since 1963 on false information

18   has been ignored by kangaroo - court agents concealing

19   the jury acquittal of 1973.

20       Several affidavits by the jurors, reads in part:

21           " During deliberations (which commenced March 26,
             1973, all twelve jurors agreed that the
22           defendant was not guilty of violating Penal
             Code 209 ( Kidnapping for purposes of extortion.)"
23
     Exhibit- 1, attached hereto.
24   ----------

25           Moreover, Affidavit reflect: " The jury gave
                 their acquittal to the trial judge before
26               he declared mistrial April 3, 1973."

27   Exhibit-2, attached hereto.
     ----------
28                                              3

Acting in an unlawful combination to suppress and hide
jury acquittal and all evidence of false imprisonment,
on August 8, 2008, the defendants and persons in direct
participation with them, carried out kangaroo court at
Corcoran prison, referring to same as Parole Hearing.

The kangaroo court read their ghost story
as fact and law over the acquittal, and evidence of
false imprisonment, labelling the plaintiff with slave
identity: Murderer, kidnapper, moran, drug and alcohol
addits.   Nothing in facts or records support the
allegations by the kangaroo court (mob) who manipulates
the court system to suppress evidence of innocence, and
jury acquittal.

The document referred as prison psychologist
evaluations are falsehood invented since 1973, before
and after jury acquittal in this matter.   The
alleged psychologist evaluations  are Marked Exhibit- 3,
attached hereto.

The documents gives the plaintiff a character
which proves false, and theft of the petitioner's
birth name.

Defendants have labelled the plaintiff a slave,
with no First - Eighth and Fourteenth Amendment, United
States Constitutional Rights.   Review of the jury
acquittal will silent all kangaroo court activity.

4

1    Defendant invented arbitrary (Rubber Stamp) Order, to

2    counter federal judge Walker's Order Vacating gag -rule.

3        Judge Walker's Order Vacating pursuant to Rule
         60, fed. Rules Civ. Proc. shows by In re RUCHELL
4        CINQUE Magee, NO.CV_05-80075, May 2, 2005,(N.D. Cal.)

5        Compare,

6        Henderson's Rubber Stamp Order based on bribe
         shows by In re RUCHELL CINQUE MAGEE, NO. Cv-05-
7        1819 TEH (PR),(May 9, 2005 .)

8

9        What The court corrected May 2, 2005, the defendant

10   Henderson, for bribe money countered with a ruling which falls

11   outside the bounds of reason.

12       January 20, 2006, the court confirmed its Order

13   Vacating the arbitrary gag rule in the decision: Ruchell

14   Cinque Magee, NO. C 05-80291 MISC VRW, N.D. Cal..,stating:

15       " May 10, 1995 pre-filing review order was recently
           vacated. Magee v Scrbner, NO. C05-80075 MISC VRW
16         (ND Cal May 2, 2005 (order) .""

17       Compare,

18       Henderson's rubber stamp order based on bribe
         shows by Mage v Scribner, NO. C 06-390 TEH (pr)
19       (ND Cal) (Jun 14 2006.)

20

21       Also Habeas corpus put under Henderson and judge

22   Jensen's arbitrary gag rule: In re RUCHELL CINQUE MAGEE,

23   NO. C 07 0091 TEH (pr)   ND Cal.

24       It should be noted, the jury foreman joined by

25   Curtis Mullins filed law suit against the state prosecution

26   for tampering with jury acquittal.   That civil action was

27   dismissed on some Ghost Story about the jury's action was

28   filed to late, or untimely showing prosecution fraud:
         SUARES, et. al., vs-Reardon, NO.C-01-0672 CRB,
         ND Cal. filed Feb. 13, 2001

1    August 8, 2008, the plaintiff's federal habeas corpus
2  was placed before defendant Henerson (In re RUCHELL CINQUE
3  Magee, NO. 08- 3754 TEH, ND Cal. pending.)

4    Filed along with the said habeas Petition, ahows
5  Application for Clearance seeking to correct defendant
6  Henderson's outrageous coverup of on - going false imprisonment
7  which cause irreparable injury.

8    The Habeas Petition show prosecution perpetrated a fraud
9  upon the court by use of knowingly and deliberately false
10 Affidavid's , used to undermind the court to believe the
11 jurors impeached each other regarding their verdicts,
12 after the jury was discharged, something the jury's cannot
13 do by law.

14    Clearance show fabricated documents get heard
15 to become gag rule.

16    Jury acquittal, and other trial court records
17 went under judges gag rule, without hearing  .

18    Jury acquittal bar the  gag rule,   because the
19 gag rule violates DOUBLE JEOPARDY PROSECUTION ( Fifth
20 Amendment Prohibition against twice prosecution ).

21    State habeas corpus show prosecution jury tampering
22 to convict in the Los Angeles case. ( In re RUCHELL CINQUE
23 Magee, NO. S165723, Calif, Supreme Court, now pending.)

24    In the Los Angeles conviction, the plaintiff's lawyer
25 failed to object to the Prosecution's false guilty plea
26 which went to the jury as Magee's admission of guilt, while
27 the plaintiff was muzzled for objecting to the false plea
28 played up as his admission of guilt to the crime of kidnap to rob.

1    THE FALSE PLEA MANIPULATED THE JURORS BY PREJUDICING

2  THEM.

3    THE FALSE PLEA TAKING THE JUROS FOCUS FROM EVIDENCE

4  OF INNOCENCE, UNTIL PROVEN GUILTY TO  MAGEE"S ADMISSION OF

5  GUILT TO THE CRIME OF KIDNAP TO ROB.

6    THE FALSE PLEA SHOWS:

7  a) Plaintiff was denied effective assistance of  counsel.

   b) The  prosecution committed jury tampering .

8  c) The prosecution forced Self - incrimination.

9  d) The evidence was insufficient to support the
      charge of kidnap to rob.

10  e) Facts and evidence of innocence are greeted with
      gag rule's and  racial bias psychologist reports by

11    those  who  find it convenient to lie, fabricate and

12    muzzle the truth and free  speech.

   f) Without judges who will uphold the law, the courts-system

13    become a joke rigged against the American public.

14

15    A sane judge is needed  in this case with courage amd respect

16  for the law to say "HELL NO TO THE CLOWNS OR CRIMINALS COMEDIANS,"

17  and review and compare: " Jury acquittal, and judges gag rule's."

18    In the game which perverts the justice system, the crime has

19  went from false pleading self - incrimination, to prison psychologist

20  reports invented become life sentences in the case of acquittal.

21  Next, view gag rules where speech is muzzled, so terrorists who

22  manipulates the court - system 'o publicly unnoticed, and unpunished.

23    Trusting judges as Thelton E. Henderson  and D. Lowell Jensen

24  becomes a curse difficult for any sane person to live with  in

25  peace with self.  Unfortunately, many people sleep on where their

26  daily troubles are coming from, in America where families are torn

27  apart as result of slavery - practicing under color of law.

28    This barbaric game played says despite jury acquittal, the
     prison psychologist death sentence is the king behind the throne.

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

1      The jury acquittal and evidence of innocence has

2    been over-thrown or reversed by a mob who manipulates the

3    courts - system.

4        Order that will stop defendant Henderson, will

5    allow jury acquittal honored.

6        Evidence will prove the plaintiff suffered false

7    imprisonment at the time he rebelled August 7, 1970.

8        Investigation may get its real lead from exposing

9    of slavery in this case.

10       Four persons was killed August 7, 1970, in Marin

11   County by prison guards who had been told that its legal

12   to kill the hostage, as long as the escape of prisoners

13   be stopped.    That illegal policy now goes to:  It legal

14   to ignore unwanted jury acquittal, and keep the black

15   slave's locked up for life on prison psychologist reports

16   or evaluations.    Trust of prison psychologist evaluation,

17   mean  not to believe the truth.    Everybody inside of

18   the van, which came under attack by guards, was set up.

19   Including the judge killed.

20       Plaintiff believe, had he not went along in the

21   rebellion August 7, 1970, he would have years ago been

22   murdered based on being isolated as set up.    Being in

23   the rebellion got him some public attention on hidden

24   evidence of the frameup by the Los Angeles Police, judge

25   and lawyers who brought corrupted prison officials  and

26   appellate judges into the picture, for cover up.

27       After acquitted, the psychologist reports goes to

    convict the plaintiff of murdering a judge.

28       Honoring the acquittal, mean condemning slavery- under

color of justice.

What is referred as pre - filing order, comes from a reactionary group who have no respect for the law.

The reactionary group also operate prisons, and fake parole Boards, which Board do not grant parole's unless forced by the courts to accept criteria requiring the prisoner's release.

In prison on frameups, the plaintiff has become victim of racist experimentation.

Defendant Henderson in combination with the racists have deliberately and willfully schemed, plotted and conspired to FORCE THE PLAINTIFF TO ACCEPT SLAVE CONDITION. Because the plaintiff is looked upon as a Black symbol who the racists wish to degrade, and make look a fool with no credibility against the super rich whites whose law game are played up as some type of god.

For instant, the jury of twelve acquitted the plaintiff. The racists ignored the acquittal, and convicted the plaintiff with stereotypes and other falsehood. Evidence of racist lies, and deception goes under gag rule's.

Acquittal honored will silent kangaroo court.

Defendants has taking advantage of the plaintiff for exercising his First Amendment Protected Rights.

As result of defendants conduct, the plaintiff suffers highly mentally cruelty; high blood pressure and posibly lung cancel which have life threaten effect, in violation of the United states Constitution, the Eighth and fourteenth Amendments.    Said clonduct cause plaintiff irreparable injury.

Defendants acted outside of their authority, and do not have judicial immunity.

1   Plaintiff have no other remedy by appeal, or otherwise,

2   and unless this court grant relief sought, the defendants

3   will continue their outrageous misconduct to obstruct

4   justice .

5   WHEREFORE, plaintiff request the court to;

6   1.  Issue a restraining order, to keep defendant Henderson

7   seperated from the plaintiff's habeas corpus in case

8   Number C-08 3754 TEH, supra, pending this action.

9   2.  Issue a restraining order, enjoining defendant
10      Henderson from tampering with evidence in issue
        before the courts, in this matter.
11

12  3.   That the court grant such further relief, as it

13  deems appropriate or just.

14  I certify under penalty of perjury the foregoing

15  is true and correct to the best of my knowledge and belief.

16

17  Dated:  August 15, 2008

18

19                                   RUCHELL CINQUE MAGEE

20

21

22

23

24

25

26

27

28

U.S. DISTRICT COURT FOR THE
NORTHERN DISTRICT CALIFORNIA

RUCHELL CINQUE MAGEE    )        NO.  CV 08   3445 JF
             vs-        )
                        )        CERTIFICATE OF SERVICE
PETER FLORES, JR        )
---------------------

     I, Ruchell Cinque Magee, declare under penalty of perjury

that I have served a copy of the attached  MOTION FOR

RESTRAINING ORDER upon:

          Attorney(s) For Defendants

Jerry Brown                          Peter Flores, JR.
California Attorney               Deputy Attorney General
455 Golden Gate Avenue           455 Golden Gate Avenue
San Francisco, CA  94102         San Francisco, CA  94102


U.S. Attorney general                Solicitor General
U,S, Dept. Of Justice            U.S. Dept. Of Justice
Washington, DC   20001           Washington, DC 20001


Thelton E. Henderson, judge
U.S. District Court                     Doe - One
Northern District                    Parole Commissioner
450 Golden Gate Avenue               Parole Board Office
San Francisco, CA  94102             P.O. Box 4036
                                     Sacramento, CA  95812
Coalition Against Judicial
Corruption
Boston, MASS




                              _Ruchell Cinque Magee_
                              RUCHELL CINQUE MAGEE

UNITED STATES DISTRICT COURT
NORTHERN ----DISTRICT OF _____ CALIFORNIA

RUCHELL CINQUE MAGEE          )        Number _Cv_08_3445_JF__
                             )
                             )
vs-                          )        PROOF OF SERVICE
PETER FLORES, Jr.            )
                             )
-------------------------------)


        I hereby Certify that on __August__15,__, 2008, I served

a copy of the attached _motion_for_restraining_Order_____

------------------------------------------------, by placing a

copy in a postage paid envelope addressed to the person(s)
hereinafter listed, by depositing said envelope in the United
states Mail at   Corcoran, California :

Solicitor General                    Peter Flores, Jr
U.S. Dept. Of Justice                Deputy Atty. Gen.
Washington, DC  20001                455 Golden Gate Avenue
                                     San Francisco, CA 94102

Doe _ONe -commissioner
Parole Board Office                  Thelton E. Henderson, judge
P.O. Box 4036                        U.S. District Court
Sacramento, CA  95812                 Northern District
                                     450 Golden Gate Avenue
                                     San Francisco, CA 94102

  Jerry Brown
  California Attorney                 U.S. Attorney general
  455 Golden Gate Avenue             U.S. Dept. Of Justice
  San Francisco, DC  94102           Washington, DC  20001


     Copy To:   Coalition Against Judicial
                Corruption
                Boston, MASS



I declare under penalty of perjury the foregoing is true and correct.

                              _Ruchell cinque Magee_
                              RUCHELL CINQUE MAGEE

# EXHIBIT

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE CITY AND COUNTY OF SAN FRANCISCO

PEOPLE OF THE STATE OF CALIFORNIA,                    No. 83668

                            Plaintiff,

                                                      DECLARATION

            vs.

RUCHELL MAGEE,

                            Defendant.

_____/

    I, Bernard J. Suares, say:

    That I was the duly elected foreman of the petit jury selected to serve in the trial of the above entitled action.

    That in the course of the jury's deliberations (which commenced on March 26, 1973 and which were terminated on April 3, 1973) all twelve jurors, after discussing the evidence and the applicable law as given to us by the Court, acting at the same time, agreed that the defendant was not guilty of the charge of violating P.C. 209 (kidnapping for purposes of extortion). At no time during the discussion of the evidence and the law, as they applied to the P.C. 209 charge, or at any other time, did any juror state that he or she agreed to the defendant's innocence on the 209 charge as a compromise in an effort to reach unanimity. In fact, prior to reaching our agreement that the defendant was not guilty of the

Exhibit-1

P.C. 209 charge all members of the jury expressly agreed among themselves that they would not allow considerations of compromise to influence their deliberations or decisions. It was the jury's unanimous stated conclusion that the prosecution in presenting its case had failed to meet its burden of proof in order to establish defendant's guilt on the 209 charge.

Thereafter, the jury's concern with respect to the first count was limited to the issue of defendant's guilt of the lesser included offense of P.C. 207 (simple kidnapping). Upon discussion of the evidence as it applied to the law, as given by the Court, we were unable to reach a decision. The jury's last ballot favor conviction on the P.C. 207 count by a vote of 11 to 1. The juror standing alone stated he favored an acquittal of defendant on all charges.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at San Francisco, California on April 27, 1973.

_____
Bernard J. Soares

The foregoing instrument is a correct copy of the original on file in this office
ATTEST
MAY 23 1995
STEPHEN V. LOVE
COUNTY CLERK
Santa Clara County
County Clerk and ex-officio Clerk of the Superior Court of the State of California in and for the County of Santa Clara
_____ DEPUTY
O. D. ERENO

Verbatim reproduction

TO WHOM IT MAY CONCERN :

Each of us undersigned, formerly jurors in the
Ruchell MaGee trial in San Francisco, has read the
Affidavit signed by jury foreman Bernard J. Suares, and
each agree that after thorough discussion of the relative
merits of the 209 charge, we eliminated it from considera-
tion by voting 11 for 207 conviction and 1 not guilty on
count 1, because of a belief, at least as to the undersig-
ned, that the state had truly not proved the 209 charge,
and not through any consideration of compromise.


S/  David F. Smith

s/  Raynell McGee

s/  Lucy Johnson

s/  Berbard J.Suares

s/  Jimmye L. Davis

s/  Kenneth R.Tysom

s/  Ruth Feifer

s/  John Chalmer

s/  Jacqueline Buckley

# EXHIBIT

2

STATE OF CALIFORNIA
COUNTY OF SAN FRANCISCO COUNTY
_____ ___, 2001

## AFFIDAVIT OF BERNARD J. SUARES

I, Bernard J. Suares, hereby depose and declare:

1. That I was elected Jury Forman in the trial of Ruchell Magee, case number 68668, Superior Court of San Francisco County;

2. That I reside in San Francisco County;

3. That at the end of the jury's deliberations (commenced on March 26th, 1973, and terminated April 3rd 1973) all twelve jurors found Mr. Magee not guilty of violating P.C. 209 (kidnapping for the purpose of extortion);

4. I informed Judge Morton Colvin by written note that all twelve jurors had reached a uninamous "not guilty" verdict.

Without rendering a judgement on the acquittal, Judge Colvin declared a mistrial on April 3rd, 1973 contradicting the law (Calif. Evidence Code Section 1150 Subdivision (a): "validity of a verdict)";

5. On April 27th, 1973, I filed a written declaration of the acquittal on the Kidnap Charge with the Superior Court of San Francisco County (Case Number 68668). Other Jurors joined my declaration with written statements confirming the acquittal;

6. I am now informed the Prosecution hid the acquittal he gave to Judge Colvin, and Judge Colvin sealed it. The Prosecutor also created a fraudulent document styled "affidavit" attributed to Junior *William Irwin* portraying the Jurors "not guilty" declaration of April 27, 1973 as being impeached;

7. As shown by the decision, (Ruchell Magee -vs- Superior Court of Santa Clara County [1973] 34 Cal. App ed 201), Mr. Magee's Court appointed lawyer, Robert D. Carrow, failed to report the acquittal given to Judge Colvin by me, before he declared mistrial. Had the acquittal been disclosed, the appellate Court would have honored the acquittal on the Kidnap charge in accordance with Evidence Code 1150, supra.



Exhibit T-2

I have appealed to the Court and have presented proof of acquittal, which is being concealed by the court in violation of the Rico Act and Mr. Magee's Constitutional right to a fair trial.

I have been ignored for more than 23 years and demand that I be heard in a court of law. I will testify and can prove that the Jury was unanimous in their declaration that they found Mr. Ruchell Magee "Not Guilty".

I declare under penalty of perjury the foregoing is true and correct to the best of my knowledge and belief.


Respectfully yours,



Bernard J. Suarés
1890 23rd Avenue
San Francisco, CA 94122


SUBSCRIBED AND SWORN TO BEFORE ME THIS 6th DAY OF August 2001.

DIANA B. TRIGUEROS
COMM. #1215897
NOTARY PUBLIC - CALIFORNIA
SAN FRANCISCO COUNTY
My Commission Expires 04-12-2003

_____
Notary Public

My Commission expires: _____ April 12, 2003 _____

SUPERIOR COURT OF SAN FRANCISCO COUNTY, CA.

People  Vs- Ruchell Magee

NO.  83668

DRAFTED NOTES (VOTES) OF THE JURORS

APRIL, 1973  ON P.C. 209 KIDNAP

1)  David F. Smith,  "NOT GUILTY."

2)  John Chalmer,  "NOT GUILTY."

3)  Mosses Shephard, " Not Guilty."

4)  Kenneth R. Jason,  "NOT GUILTY."

5)  Bernard J. Suares,  "NOT GUILTY."

6)  William Irwin,  " NOT GUILTY."

7)  Jacqueline  Buckley,  "NOT GUILTY."

8)  Raynell McGee,  " Not Guilty."

9)  Barbara Giddis,  "NOT GUILTY."

10)  Ruth  Feifer,  " NOt Guilty."

11)  Lucy Johnson,  " NOT GUILTY."

12)  Jimmie Davis,  "NOT GUILTY."

_Bernard J. Suares_
Bernard J. Suares

EXHIBIT_ 3

# PSYCHOLOGICAL EVALUATION ADDENDUM
## FOR THE BOARD OF PAROLE HEARINGS
### OCTOBER 2007 CALENDAR
### FORENSIC ASSESSMENT SERVICES DIVISION
### CALIFORNIA STATE PRISON CORCORAN

## I.  IDENTIFYING INFORMATION

| | |
|---|---|
| Inmate Name: | MAGEE, Ruchell |
| CDC-R Number: | A92051 |
| DOB (Current Age): | 3/16/39 (68) |
| Controlling Offense: | Offense 1: kidnap/robbery |
| | Offense 2: kidnap |
| Date of Offense (Age at time): | Offense 1: 3/23/63 (24) |
| | Offense 2: 8/7/70 (31) |
| Sentence: | Offense 1: Seven to Life |
| | Offense 2: Life |
| County of Commitment: | Los Angeles |
| Date Entered into CDCR: | 8/31/65 |
| Date Received at CSP-COR: | 2/26/2000 |
| Classification Score: | 225 |
| CDCR Forensic Evaluator: | Dr. Hartung, Contractor |
| Date of Evaluation: | 9/10/07 |

## II.  SOURCES OF INFORMATION

The inmate's Central File and Unit Health Record (UHR) were reviewed.  This review included a full psychological evaluation report on the inmate for the Board of Parole Hearings (BPH) authored by Dr. Kuberski, and dated 5/31/05.  Several previous psychological and psychiatric evaluations were reviewed, including those of Dr. Steele (6/04), Dr. Chiurazzi (4/03), Dr. Kralj (8/96), Dr. Sutton (7/74), Dr. Williams (10/73), and Dr. Schmidt (12/70 and 12/71).  For the purpose of the current evaluation, the inmate was interviewed on 9/10/07 for approximately two hours.  He was informed that the interview was not confidential and that a report with the results of the evaluation would be submitted to the BPH to assist in determining his eligibility for parole.  The inmate appeared to understand the nature of the evaluation and the possible consequences of the interview to the best of his ability.  For reasons not limited to the possibility that an individual may have a mental disability or condition, which may qualify under the Americans with Disabilities Act, the evaluation was conducted by a licensed psychologist.  Also, it is the conclusion of the undersigned examiner that it was not necessary to provide auxiliary aids or assistance to achieve effective communication.  This evaluator is not responsible for any inaccurate statements, or subsequently changed opinions, expressed by the inmate.

This current report is an addendum for update to the BPH, and only information relevant to the current assessment, and more recent to prior reports, will be addressed.

## III.  QUESTIONS POSED BY MOST RECENT (September, 2005) BPH

After the inmate's September, 2005 BPH hearing, the panel subsequently submitted BPH Form 1000(a) requesting an updated psychological assessment of the inmate to include:
1) The prisoner's violence potential in the free community;
2) The significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from the use/abuse of same when released;
3) The extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes; and,
4) The need for further therapy programs while incarcerated.

## IV.   INTERVIEW INFORMATION

At the outset of the interview for the purpose of this report to the Board of Parole Hearings, the planned focus was to update any information relative to the most recent full evaluation, as well as to deal with any unexamined issues relative to intrapersonal functioning at the time of the index offense.  Mr. Magee was alert and oriented in all spheres, demonstrated clear and unimpaired cognitive functioning, and was organized in expressing his thoughts and feelings in a meaningful fashion.  He was assessed as having normal cognitive functioning without related adaptive needs (NCF) by the prison psychology staff, and his most recent (5/16/02) TABE test results placed the inmate at the 4.4 grade level (reading).  The inmate remains in communication with "quite a few friends," writing to a friend in the Bay Area a couple of times a week, and adding that, "Some people write just to say hello."  Further, he stated "most all my family is dead."  Current leisure time activities include studying law, both criminal and civil; playing dominos, and some basketball.  He watches TV, mainly talk shows, which included *Oprah*.

INSTITUTIONAL PROGRAMMING:  At present, Mr. Magee remains programming on the Level 4 yard at Corcoran, where he goes to school from 8 in the morning until 2:30 in the afternoon, Monday through Friday.  He queried, "What's a GED going to do for me going on 70 years old?"  While in prison, the inmate's programming has remained stable since the last report.  He has received no disciplinary infractions since the last report, reflecting continued compliance with rules and expectations in the prison for the past two years.  His last RVR was in 2005 for refusing a cellmate; however, his statement in the interview was that he had had no 115s since 2003.   His classification score is 225 and has been declining in recent years such that, in recent years, he has not been viewed as a management problem by custody staff.  He is not currently a member of the Mental Health Services Delivery System (MHSDS), nor has he ever been since his CDCR imprisonment began in 1965.

INSIGHT / SELF ASSESSMENT:  The inmate reported his greatest strength as "I think it would be constantly thinking people put on acts....people look like they're recycling things, things I walked away from.  Nothing new."  He stated his biggest weakness was "trust, maybe."  When asked about the accomplishment in which he takes the most pride,

Mr. Magee replied, "I opened my mind to a lot of things and have come to a better understanding of things; some of the things I was right about, too." He opined that the biggest change in him over the past 42 years of his imprisonment was, "I trust myself. I came out here believing whatever anybody would say. There was a lot of imitating things you saw in Louisiana prison."

PAROLE PLANS IF GRANTED A RELEASE:  The inmate said that if he was paroled he would "go back to Louisiana and lay on that farm with my cousin. I have a patch of land down there. I can't see 'em giving me a parole now anyway. This plan remains unchanged and was also reported in his LPE of 5/2004. His parole plan was vague, and did not appear feasible, as it would involve out-of-state parole of a high-profile inmate. He has not made significant plans to parole since he believes he will not be paroled.

INMATE UNDERSTANDING OF LIFE CRIME:  The inmate reported that, "When I came out here I was young and I had a chip on my shoulder from Louisiana State Prison." When asked how this "chip on his shoulder" developed, he replied "from school. You have to prove yourself in school." He went on, "I run into this guy and we have a dispute over this gal and he pulled a gun on me. Couple of weeks later, we got into the same thing, we had a fisticuffs, he ran and called the police, next thing I knew I got a robbery/kidnap. The man told almost the whole thing on the witness stand." When asked how his multiple crime (1970) had its impetus, he replied, "I was trying to reach TV and the news, instead I got shot." He related that he was trying to get publicity about the unfairness of his case from 1963, and went on to argue that he had been acquitted in his trial from his case of 1970. It was clear that the inmate felt that he'd been unfairly treated by the justice system, and appeared bitter about his mistreatment.

The inmate's version of his original robbery/kidnap offense remained unchanged from the version he gave to the probation officer for his August 1965 hearing date [pages 5, 6, POR 8/65]. The inmate stated, "Compare taking $10 from someone and driving him a few feet." He described that he was offered an 18-month plea deal, but when he thought about what he did, he could not bring himself to plead guilty, stating that his public defender entered a guilty plea "without my input, he just did it. After all these years, I still can't see it."

For reference, a description of the inmate's life crime is provided as follows:  On March 23, 1963, the inmate and a crime partner kidnapped and robbed a man at gunpoint (carjacking); the victim escaped after having been kidnapped in his own car.

The inmate incurred a multiple crime when on August 7, 1970; he and other inmates were transported to Marin County Courthouse to testify in a trial. The inmates took control of the courtroom, holding the judge and jury hostage; they tied a shotgun to the judge's neck. While fleeing in a van, it appeared that inmate Magee pulled the trigger on the shotgun that was around the judge's neck, blowing his head off. The district attorney was permanently paralyzed by gunshot, and a female juror was shot. Three inmates also died.

<u>MENTAL HEALTH CONCERNS OR PERSONALITY DISORDERS</u>:  There are no current mental health concerns, and diagnostically it is this examiner's opinion that based on the inmate's history of substance abuse (cannabis, alcohol), he meets criteria for a substance abuse disorder.  Mr. Magee indicated that he perhaps had a few beers prior to the kidnap/robbery, and records indicated that he had smoked marijuana earlier as well.  He had previously been incarcerated in a Louisiana prison for rape at the age of 16; the inmate was on parole from Louisiana at the time of his kidnap/robbery offense.

Historically, he has carried a diagnosis of Antisocial Personality Disorder.  This indicated that he has presented an enduring pattern of inner experiences and behaviors, evident across a broad range of personal and social situations, that are experienced as problems in areas such as internal dysphoria (abandonment concerns, over-conformity and over-rebellion, decreased esteem), deficient or variable interpersonal functioning (failure to conform with societal norms, impulsivity, aggressiveness, disregard for safety of self or others, irresponsibility, blaming others for undesirable situations), and/or poor self-perception.  Such a pattern has led to significant distress or impairment in various areas of functioning, and is suggestive of traits associated with a personality disorder.  Due to the nature of personality traits, this diagnosis could remain with the inmate until he is able to demonstrate continued prosocial and unimpaired functioning for a protracted period of time without being under a supervised custodial living circumstance.

## V.  DIAGNOSTIC IMPRESSION

| Axis I:   | 305.00 | Alcohol abuse, remission, in controlled environment |
|           | 305.20 | Cannabis abuse, remission, in controlled environment |
| Axis II:  | 301.7  | Antisocial Personality Disorder |
| Axis III: |        | Hypertension; Gout (right leg mainly) |
| Axis IV:  |        | Incarceration for life term |
| Axis V:   |        | GAF:  75 |

## VI.  PREVIOUS EVALUATION SUMMARIES

There is no evidence of mental illness in the inmate.  There was documentation of alcohol and cannabis abuse prior to his incarceration.  That abuse appears to have been in long remission, though in a controlled environment.  He had a previous commitment in a Louisiana prison for aggravated rape at the age of 16, and was on parole at the time of his original offense of kidnap/robbery.  Though he has had over 70 115s during his 42 years of incarceration, he has had fewer 115s in recent years, and the last were for refusing a cell mate.  He has been less of a management problem in recent years than earlier in his incarceration.  Diagnostic assessment and conclusions remain unchanged from previous reports submitted to the BPH by Dr. Kuberski (7/05), Dr. Steele (6/04), and Dr. Chiurazzi (4/03).  Those previous reports on the inmate have suggested that risk assessment for

involvement in violent behaviors has been moderate and that estimate remains unchanged at present.

## VII.   RISK ASSESSMENT/CONCLUSIONS

The Board of Parole Hearings' questions will be addressed for each issue presented, as noted in an earlier section of this report.

### 1) *The prisoner's violence potential in the free community:*

In the "historical" domain of assessing likelihood of future violence, available information indicated that the inmate had significant early adjustment problems in which he apparently dropped out of school by 7th grade due to frequent arrests and detainments. At 16 he was convicted of aggravated rape in Louisiana, and based on his description of his involvement with girls/women, and history of STDs, a pattern of sexual promiscuity was evident. He had a history of failure on supervised release as he was on parole at the time of his 1963 kidnap/robbery offense. He had a history of numerous rule violations reports, as well as his 1970 multiple crime in volving kidnap, hostage-taking, and murder in Marin County. He has made progress in recent years in accumulating fewer disciplinary reports. His classification score is 225. In this domain, the inmate presents a high risk of future violence. Given that the bulk of data contributing to this estimate is historical, then by definition, this score is not amenable to significant change regardless of the number of years of his incarceration.

In the "clinical" or more current and dynamic domain of risk assessment, the inmate appeared glib and superficial in his description of his criminal history, and offered numerous excuses and blame on others for behaviors as related to the offense. He exhibited a sense of grandiosity in his portrayal of being the focus of persecution by the system. His behavioral history indicated a high need for stimulation with a history of pathological lying, as well as manipulativeness. He did not display remorse or guilt over past criminal behaviors. He appeared to have a parasitic lifestyle with a poor work record prior to incarceration, and there was a pattern of apparent sexual promiscuity. He had early behavior problems and has manifested impulsivity, irresponsibility, and inability to accept responsibility for his own actions, as well as juvenile delinquency and poor performance on conditional release, and criminal versatility. He has adequate access to the appropriate use of judgment and reasoning, no significant attitudinal difficulties, though he appeared very embittered, has no major mental illness, and is emotionally and behaviorally stable. In this domain, the inmate presents a high **moderate** risk of future violence.

As for the "management of future risk" domain, Mr. Magee will be exposed to a variety of situations in the community which may have led to violence in the past and which may try coping skills in the future. Therefore, it is also important to determine the likelihood of the inmate's exposure to significant stress and/or destabilizers, as well as evaluating the nature and extent of outside support and how the inmate will respond to that support. In this inmate's case, he has some vague plans of returning to Louisiana to rest on a farm, and

there was some indication that he was not sure that he should parole. At this time, the inmate presented as being very amenable to any recommendations or requirements as set forth by the BPH in helping to justify a parole, yet has not verbalized a viable, feasible parole plan that addresses areas of potential recidivism, such as psychosocial stressors, social support, alcohol/drug use or social affiliations. In this domain, the inmate presents a high **moderate** risk of future violence.

Overall, then, risk assessment estimates suggest that the inmate poses a high moderate likelihood to become involved in a violent offense if released into the free community. This estimate takes into account the inmate's cultural background, personal, social and criminal history, institutional programming, community/social support, release plans, and current clinical presentation. In addition, there is the caveat that such an assessment is at least partially based on the likelihood of continued abstinence from any substance abuse.

*Note – There have been prior requests by the board that an inmate's violence potential be "compared to the average citizen." In most respects, this is not conceivably possible, given the relatively low incidence of violence in free society, and the fact that the "average citizen" has not been convicted of a violent felony, much less murder. Moreover, there is no definitive research that reliably compares risk of future violence in life term inmates (who have been released) with that of citizens without a record of violence. Risk of violent reoffense will only be offered relative to the "normative" population, in this case, other life term inmates. The lowest risk life term inmate in CDCR will, given his violent behavioral conviction history, invariably be adjudged higher than the "average citizen" when it comes to risk for future violence.*

As was affirmed in the psychological evaluation by Doctors Kuberski, Steele, and Chiurazzi, the inmate's insight was adequate and accessible, and this estimate is currently unchanged. It should be explained that "insight" is an abstract concept and, like that of "remorse," does not lend itself to quantifiable measurement; thus, in both instances, there is no solid research that can identify such concepts, or arbitrary "levels" thereof, as causal or requisite factors in behavior change or prediction. Mr. Magee's overall level of risk for future violence in the community was in the high **moderate** range, and no suggested increases or decreases in his "insight" will lower this assessment.

*2) The significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from the use/abuse of same when released:*

There was evidence that the inmate abused marijuana and alcohol in the years prior to his original incarceration in the early 60s. That abuse appears to have long been in remission while in a controlled environment. His extended period of institutional remission may be a protective factor. The inmate does not consider his drug/alcohol background as relevant; he has no parole plans surrounding support for this issue.

*3) The extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes:*

it is unlikely that a requirement for further exploration of the instant offense will produce more significant behavioral changes of a positive or prosocial nature in the inmate.

4) *The need for further therapy programs while incarcerated:*

The inmate does not currently present as a candidate for any noteworthy change as a result of psychotherapeutic intervention. Ongoing education, and involvement in self-help, self study (bibliotherapy), or introspective treatments groups (if available to life term inmates without mental health issues) is encouraged, but his group treatment should not be considered mandatory.

Bradley D. Hartung, Ph.D., CA License PSY 10911
Forensic Psychologist / Forensic Assessment Division
Board of Parole Hearings
California Department of Corrections and Rehabilitation

01/14/08
Date Submitted

Reviewed by:
Jasmine A. Tehrani, Ph.D., CA Psychologist License# PSY 18932
Senior Psychologist, Supervisor
Board of Parole Hearings
California Department of Corrections and Rehabilitation

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use, or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act and the Health Insurance Portability and Accountability Act (HIPAA). If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

**LIFE PRISONER EVALUATION**
**SUBSEQUENT PAROLE CONSIDERATION HEARING**
**APRIL 1999 CALENDAR**

**MAGEE, Ruchell**                                           **CDC #A-92051**

I.   **Commitment Factors**:

A.   **Life Crime**:  Count 1, Kidnapping for the Purpose of Robbery (PC 209), Use of a Deadly Weapon, Count 2, Case #272227, Los Angeles County.  Sentence: Life. Victim: Ben Howard, age unknown.

1.   **Offense Summary**:  On March 23, 1963, at approximately 2:00 p.m., the victim, Ben Howard, was seated in his car outside the Tropicana Club at Manchester and San Pedro Streets when Inmate Magee and co-defendant, Leroy Stewart, approached the car.  Magee pointed a gun at the victim and ordered him to the passenger's side of the car. He then entered the driver's side while Stewart entered the rear seat. Magee then gave the gun to Stewart who placed the gun against the victim's head and demanded his money. The victim give him $10.00. Magee drove the car to Compton when the victim escaped from the car around the 900 block of North Tajanta Street. The victim notified the police of the incident and Magee was arrested by the Los Angeles Sheriff's Department on March 26, 1963, while driving the victim's car. The previous information is contained in the Probation Officer's Report (POR) of June 11, 1963, pages 3 and 4.

2.   **Prisoner's Version**:  Magee had nothing to say about his crimes to this writer; however, it was noted in the POR that Magee claimed to have just been trying to get even with the victim over a dispute which revolved around a female. He stated that he did have a gun during the incident, but that it was retrieved from the victim's vehicle and that the victim had no knowledge of it. He further stated that the car was pushed from the location where the victim escaped as the victim had taken the keys from the ignition.

3.   **Aggravating Circumstances**:

a.   The crime involved the Use of a Weapon (Firearm).

b.   The crime involved the Robbery of Another Individual.

c.   Inmate Magee had just paroled from prison for a previous violent crime.

4.   **Mitigating Circumstances**:  None.

B.   **Multiple Crimes**:  Kidnapping (PC 209) Count 1, Case #56168, Santa Clara County. Sentence: Life. Victims: Harold Haley, age unknown, Gary Thomas, age unknown and three unidentified female victims.  .

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION HEARING
APRIL 1999 CALENDAR
PAGE 2

1. **Offense Summary**: On August 7, 1970, Magee and a William Christmas were transported to Marin County Courthouse under the pretext of testifying in the criminal trial of another San Quentin inmate, James McClain. During the course of the trial, a Jonathan Jackson stopped the trial by displaying a handgun in the courtroom. He gave the gun to McClain who pointed it at Haley and stated that if anyone moved he would kill the judge. Magee stepped down from the witness stand to have the bailiff remove his handcuffs while Jackson approached the bench with a briefcase which contained a number of items including, tape, coiled wire, and what appeared to be sticks of dynamite taped together. McClain began to tape a sawed off shotgun around Haley's neck. The group subsequently left the courtroom with Haley, Thomas, and three unidentified female jurors wired together around the waist as hostages. Once in the courthouse hallway, they systematically removed all weapons from the deputies on duty. They continued to keep the shotgun around Haley's neck. They exited the court house and climbed into a yellow van with Jackson and McClain entering the front and remaining individuals entering through the rear door. They drove the van toward the South Arch where they approached a road block that had been set up near the Civic Center and the intersection of the road they were on. They stopped approximately 30 yards from the road-block when they spotted a correctional officer behind the car next to them. The correctional officer was fired at by McClain who was subsequently shot in the hand by the officer with a rifle. At that point, it appeared that Magee pulled the trigger on the shotgun that was around Haley's neck and his right side of his head was blown away. Thomas grabbed the pistol from McClain's hand and shot Jackson, McClain, Christmas, and Magee before being shot from an unknown source. As a result of the occurrence, Haley, McClain, Jackson, and Christmas were dead. Thomas was permanently paralyzed, and one unidentified female juror was shot.

2. **Prisoner's Version**: Magee refused to discuss his crime with this writer. It was noted that he pled guilty to the offense of Kidnapping as a result of a plea bargain wherein the Murder charge was dropped.

3. **Aggravating Circumstances**:

   a.   The crime involved the loss of several human lives.

   b.   The crime indicated premeditation and planning.

   c.   Inmate Magee was incarcerated at the time of the crime.

   d.   The crime resulted in the permanent injury to an individual.

   e.   The crime involved a high degree of callousness.

   f.   Inmate Magee expresses no remorse for the crime.

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION HEARING
APRIL 1999 CALENDAR
PAGE 3

    g.    The crime involved the use of several weapons (not proven in court).

    4.    **Mitigating Circumstances**:  None.

  C.    **Multiple Crimes**:  Robbery 1st (PC 211) Count 1, Use of a Deadly Weapon.  Case #272227, Los Angeles County.  Victim: Ben Howard, age unknown.

    1.    **Offense Summary**:  During the commission of Magee's initial Life Crime, he committed Armed Robbery as described.

    2.    **Prisoner's Version**:  Magee refused to discuss his crime with this writer.  It was noted that he denied any robbery on his POR pages 5 and 6.

II.  **Preconviction Factors**:

  A.    **Juvenile Record**:  Magee was arrested and convicted of an Attempted Rape at the age of sixteen.  He served approximately six years and seven months of a twelve year sentence for the crime at Louisiana State Prison in Angola.

  B.    **Adult Convictions**:  Magee arrested as an adult on the instant offenses only.  The preceding information was obtained from his POR and CI&I Rap Sheets.

  C.    **Personal Factors**:  Magee refused to discuss anything with this writer, but previous report claims to be an only child born to Elemer Magee and his father Walter Lewis.  This is a result of a liaison between Elemer Magee and his father Walter Lewis.  It appears that Magee never knew his biological father and that he received little discipline growing up.  He attended school, but never finished as a result of his incarceration at the age of sixteen.  He moved to California after being released from prison in 1962 to reside with an aunt.  He had a sporadic employment history of menial jobs.  He was unemployed at the time of his commitment offense.  He has never served in the military.  He is of below-average intelligence, but appears to be in good physical health.  He has had episodes of questionable mental status; however, he refused to receive a psychological or psychiatric intervention.  He has been uncooperative regarding psychiatric evaluations in the past.  He has remained single throughout his incarceration and has never fathered any children.  He has claimed a variety of religious affiliations, but has not indicated any religious preference.  He has no known chemical dependencies, but experimented with marijuana and alcohol on the streets.

III.  **Post Conviction Factors**:

    **Overall Prison Adjustment:**  Magee has received several serious disciplinary reports during his incarceration.  In addition, he received his second life term while incarcerated.  Magee failed to enhance his personal development while in the

MAGEE, Ruchell       A-92051         PBSP        SUBSEQUENT HEARING
APRIL 1999                                                01/21/99:AR/sz

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION HEARING
APRIL 1999 CALENDAR
PAGE 4

Security Housing Unit (SHU). He has written several letters to various individuals threatening their lives. He repeatedly refused any attempts at psychological or self-help intervention. Magee was released from Pelican Bay State Prison (PBSP-SHU) to PBSP-IV General Population per the Departmental Review Board (DRB) of November 9, 1995. While Magee has been housed in the General Population he has been assigned to a Dining Room and per his supervisor is an exceptional worker and is currently assigned to ABE II. Magee has not received any CDC 115's during this period from July 24, 1996 through January 20, 1999. Magee did receive a CDC 128A dated July 9, 1998, for Possession of Unissued Property. Magee appeared before the Board of Prison Terms (BPT) on November 7, 1996. Magee's parole was denied for two years. The BPT made the following recommendations: 1) Remain disciplinary free; 2) Work towards reducing custody level to allow for programming opportunities; 3) Upgrade vocationally and academically; and 4) Participate in self-help programs. Magee does not seem to have any mental or medical needs at this time.

IV. **Future Plans**: Magee refused to discuss anything with this writer, but per previous report he claimed to have a farm in Louisiana at 713 20th Avenue, Franklin, Louisiana 70438. Magee's plans are to move to this property and living alone. For his employment, Magee plans on starting his own trucking business. Magee did indicate that he did have some relatives in Louisiana; however, no addresses were given.

V. **Summary**:

A. Considering the commitment offense, prior record, and prison adjustment, the writer believes Magee would probably pose a high degree of threat to the public at this time, if released from prison.

B. Prior to release, Magee could benefit from continuing to be disciplinary free, participating in a work assignment, completing trade training, and participating in a self-help therapy program.

C. This Board Report is based upon four (4) hours of central file review, several contacts with Magee during normal casework contact.


A. Redden
CORRECTIONAL COUNSELOR I

C. Patten
CORRECTIONAL COUNSELOR II


MAGEE, Ruchell          A-92051          PBSP          SUBSEQUENT HEARING
APRIL 1999                                              01/21/99:AR/sz

BOARD OF PRISON TERMS           STATE OF CALIFORNIA

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐   DOCUMENTATION HEARING

☑   PAROLE CONSIDERATION HEARING

☐   PROGRESS HEARING

## INSTRUCTIONS

TO CDC STAFF:    DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.

TO BPT STAFF:    FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED. i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 07/24/96 to 08/30/96 | | | HOUSING: Inmate Magee remained housed at Pelican Bay State Prison (PBSP) throughout this period. CUSTODY: Remained at CLO BR throughout this period. WG/PG: A2/B throughout this period. ASSIGNMENT: Remained unassigned throughout this period. DISCIPLINARY: Remained disciplinary free this period. |
| 08/31/96 to 08/30/97 | | | HOUSING: Magee remained housed at PBSP throughout this period. CUSTODY: Remained at CLO BR throughout this period. WG/PG: Started this period at A2/B then A1/A on 02/27/97, for the remainder of this period. ASSIGNMENT: He was assigned to the Dining Room on 02/27/97, through the end of this period. DISCIPLINARY: Remained disciplinary free throughout this period. |
| 08/31/97 to 08/30/98 | | | HOUSING: Magee remained housed at PBSP throughout this period. CUSTODY: Remained at CLO BR throughout this period. WG/PG: A1/A throughout this period. ASSIGNMENT: At the beginning of this period Magee was assigned to the Dining Room. A CDC 128B dated 05/06/98, states Magee is an exceptional worker. He received two (2) Supervisor's Work Reports with above average and exceptional. Magee was assigned to ABE II on 05/02/98, for the rest of this period. DISCIPLINARY: He received a CDC 128A dated 07/09/98, for Possession of Unissued Property. |
| 08/31/98 to 01/20/99 (Present) | | | HOUSING: Magee remained housed at PBSP throughout this period. CUSTODY: Remained at CLO BR throughout this period. WG/PG: A1/A throughout this period. ASSIGNMENT: He was assigned to ABE II throughout this period. DISCIPLINARY: He remained disciplinary free throughout this period. |

| CORRECTIONAL COUNSELOR SIGNATURE | | DATE |
|---|---|---|
| A. Redden, CCI | _A. Redden_ CCI | 1-26-99 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| MAGEE, Ruchell | A-92051 | PBSP | 04/99 | |

01/21/99: AR/sz

# LIFE PRISONER EVALUATION
## SUBSEQUENT PAROLE CONSIDERATION HEARING
### NOVEMBER 1996 CALENDAR

**MAGEE, Ruchell**                                                    **CDC #A-92051**

I.    **Commitment Factors:**

    **A.**    **Life Crime:**  All relevant documents from the previous hearing, including the transcripts, have been considered and that information appears valid, and this writer has no further information to add.

    **B.**    **Prisoner's Version:** Remains the same as stated in the previous hearing.

    **C.**    **Aggravating and Mitigating Circumstances:** Remains the same as stated in the previous hearing.

II.    **Pre-Conviction Factors:**  Documents from the previous hearing have been considered and that information remains valid.

III.    **Post-Conviction Factors:**  Documents from the previous hearing have been considered and that information remains valid.  During the period of time since the last hearing, MAGEE's behavior has improved, in that he started a dialogue with staff at Pelican Bay State Prison (PBSP) by participating in Classification Hearings and has been interviewed by psychiatric staff.   The result of MAGEE's attitude change brought about a Departmental Review Board (DRB) action releasing MAGEE from the Security Housing Unit (SHU).  MAGEE has continued in remain disciplinary free and is currently on the waiting list for a job.  Since MAGEE's release from SHU, his relationship with staff and inmates have proved to be positive.

IV.    **Future Plans:**   MAGEE claimed to have a farm in Louisiana, at 713 20th Avenue, Franklinton, Louisiana 70438.  MAGEE's plans are to move to this property and living alone.  For his employment, MAGEE plans on starting his own trucking business.  MAGEE did indicate that he did have some relatives in Louisiana, however, no addresses were given. MAGEE does not currently have any holds or warrants.

V.    **Summary:**

    **A.**    Considering the commitment offense, prior record and prison adjustment, the writer believes MAGEE would probably pose a high degree of threat to the public at this time, if released from prison.

    **B.**    Prior to release, MAGEE could benefit from continuing to be disciplinary free, participating in a work assignment, completing trade training and participating in a self-help therapy program.

| MAGEE, Ruchell | A-92051 | PBSP | SUBSEQUENT HEARING |
|---|---|---|---|
| NOVEMBER 1996 | | | 07/23/96:RT/kd |

LIFE PRISONER EVALUATIC
SUBSEQUENT PAROLE CONSIDERATION HEARING
NOVEMBER 1996 CALENDAR
PAGE 2

C.     This Board Report is based upon four (4) hours of central file review, thirty (30) minutes of interview and several contacts with MAGEE during normal casework contact.


R. TRUJILLO
Correctional Counselor I


M. NORGAARD
Correctional Counselor II

BOARD OF PRISON TERMS
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 06/10/94 To 08/30/95 | | | During the start of this period S was housed at Pelican Bay State Prison (PBSP) Security Housing Unit (SHU), with Maximum (MAX) AR custody, Work Group/Privilege Group (WG/PG) D1/D, Classification Score (CS) 299. On 06/30/94, S appeared before PBSP FAC C Institutional Classification Committee (ICC) for his Annual/CDC 114D Review. S was received by PBSP SHU on 09/18/90, from Corcoran (COR) to serve an Indeterminate (INDET) term as a public interest case due to his continued threat to the safety of others and the security of the institution. Committee noted in review of S's history that he had participated in acts which have directly contributed to death and injury of others. Subsequent to these actions, he engaged in a letter writing campaign threatening public officials. S had refused to attend the Classification Committee which necessitated this Counselor to interview S in the housing unit. S adamantly refused to attend the Classification Hearing with regard to discussing his potential release from SHU. Additionally, he refused to engage in any dialogue with the Psychiatric (PSYCH) Department. A review of S's recent correspondence does nothing to allay Committee's concern that S will refrain from engaging in highly Assaultive Behavior. Without any additional information to allay Committee's concerns, Committee chose to refer S's case to the Classification Staff Representatives (CSR) recommending continued SHU INDET placement at PBSP. Committee indicates that as such time as S will engage himself in dialogue with staff so that staff may assess and treat any needs prior to release. Committee will reconsider referral to the CSR for general population (GP) consideration. On 08/10/94, S was reviewed by the CSR and endorsed to PBSP SHU INDET based on S's continuing refusal to cooperate w/staff so that his current potential for violence, his mental status and his ability to inter-react w/other inmates in a GP setting, may be evaluated. It would be impossible to determine how much threat he continues to pose to the safety of others and the security of the institution, or whether he himself would be able to program safely in a GP. Staff may re-submit the case if S decides to cooperate in an evaluation of these issues, and that evaluation indicates a new CSR referral is appropriate. On 09/20/94, S appeared before PBSP FAC C Unit Classification Committee (UCC) for his 120 Day Review. Committee noted that S is |

CORRECTIONAL COUNSELOR SIGNATURE

CCI  R. TRUJILLO

DATE 7-31-96

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| MAGEE, Ruchell | A-92051 | PBSP | 11/96 | |

BPT 1004 (REV. 7/86)

PAGE 1 of 3

07/23/96:RT/kd

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA

## CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 06/10/94 To 08/30/95 (Continued) | | | currently being retained in SHU on INDET status due to the threat he poses to the safety of others and the security of the institution. Committee also notes that in the past S has consistently refused to come to the Committee. Committee therefore commended S for his appearance. S stated that he currently was in litigation concerning his SHU housing. It was noted that past Committee's have requested S to undergo PSYCH evaluation in order to gather information concerning the appropriateness of release from SHU. S stated he refused in the past for a PSYCH evaluation as he felt it would be used against him. Committee elected to continue S in his present program with his next scheduled Committee appearance on 01/17/95, for his 120 Day Review. On 01/03/95, S appeared before PBSP FAC C UCC for his 120 Day Review. Committee noted that S was endorsed by the CSR for SHU INDET status based on his behavior. After review of S's case factors, Committee acts to retain S on SHU INDET status pending his Annual Review by ICC. On 02/07/95, S appeared before PBSP FAC C UCC for his Post Board Review. S acknowledged understanding of Board of Prison Terms (BPT) actions with regards to his Subsequent #8 Hearing. It was noted that S refused to appear before the BPT Hearing, which was therefore held in absentia. The BPT made the following recommendations/request: 1) Become disciplinary free; 2) Work towards reducing custody level; 3) Upgrade vocationally and educationally; 4) Participate in self-help. S stated that the information being used to retain him in prison by BPT is outdated. S further stated that he is currently appealing this issue. It is noted that the BPT elected to deny parole for a period of two (2) years. On 06/15/95, S appeared before PBSP FAC C ICC for his Annual/CDC 114D Review. Committee noted that in the past, S had refused to be evaluated psychiatrically. Staff has taken the posture that this evaluation is necessary in order to evaluate the S's potential for violence, current mental status, and ability to interact with other inmates in a GP setting. S stated to Committee that he requested a 30 day postponement in order that he could confer with other persons in order to make a decision with regard to being interviewed by any representative of the PSYCH DEPT. Based upon S's request, Committee elected to postpone action on this issue for a period of 30 days. On 08/24/95, S appeared before PBSP |

**ORDER:**

☐ BPT date advanced by _____ months.

☐ PBR date advanced by _____ months.

☐ BPT date affirmed without change.

☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed. _____

☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| MAGEE, Ruchell | A-92051 | PBSP | 11/96 | |

07/23/96:RT/kd
PERMANENT ADDENDA

BPT 1004 (REV. 7/86)                    PAGE __2__ of __3__

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 06/10/94 To 08/30/95 (Continued) | | | FAC C ICC for a Special Review. Committee noted that as this is a public interest case, the Warden elected to review the case in absentia and to refer the case to Departmental Review Board (DRB) for GP placement. S did not receive any CDC 115's during this period. |
| 08/31/95 To 07/23/96 | | | During this time frame S was housed at PBSP SHU with INDET status due to his continued threat to the safety of others and the security of the institution, w/MAX AR custody, with CS 295, WG/PG D1/D. On 10/03/95, S appeared before PBSP FAC C UCC for the purpose of 120 Day Review. After review of S's case factors, Committee acted to retain S on SHU INDET status pending his 120 Day Review by UCC or Annual Review by ICC. On 11/09/95, S was referred to the DRB for release from SHU INDET to GP. The circumstances are: S has been on INDET SHU since 1986, and was serving determinate SHU terms prior to that date and time since 1977 for disciplinary reasons. S had started a dialogue with staff at PBSP by participating in Classification Hearings and had been interviewed by PSYCH staff. The institution recommended release to PBSP GP. The DRB action of 11/09/95 CSR also recommended release to GP. The DRB action of 11/09/95 recommendation is to release S to PBSP GP. The members of the DRB are M.T. Pickett, Deputy Director Acting Institution Division; B. Long-Oliver, Deputy Director Acting Parole and Community Service Division; and M. Kaldelage, Chief Classification Services Unit. On 11/16/95, S appeared before PBSP FAC A UCC for his Initial Classification Review. Upon review of the central file and updating of all pertinent documents, Committee acts to place S on CLO B custody, with WG/PG A2/B effective 11/14/95, and place on the Support Service (SS), Food Service (FS), and Adult Basic Education (ABE) II waiting list. Committee notes that S was released from PBSP SHU INDET status based on DRB, dated 11/09/95. On 05/23/96, S appeared before FAC A UCC for his Annual Review. S's CS was reduced by 4 points reflecting a current score of 291. S is currently unassigned and Committee acts to continue S in his present program. S did not receive any CDC 115's during this time period. |

ORDER:

☐ BPT date advanced by _____ months.      ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.      ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| MAGEE, Ruchell | A-92051 | PBSP | 11/96 | |

07/23/96:RT/kd

PERMANENT ADDENDA

BPT 1004 (REV. 7/86)

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION HEARING
OCTOBER 1994 CALENDAR

A-92051

MAGEE, Ruchell

I.  **Commitment Factors**:

A.  **Life Crime:**  Count 1, Kidnapping for the Purpose of Robbery (PC 209), Use of a Deadly Weapon, Count 2, Case #272227, Los Angeles County.  Sentence: Life.  Victim: Ben Howard, age unknown.

1.  **Offense Summary**:  On March 23, 1963, at approximately 2:00 p.m., the victim, Ben Howard, was seated in his car outside the Tropicana Club at Manchester and San Pedro Streets when the prisoner and co-defendant, Leroy Stewart, approached the car.  Magee pointed a gun at the victim and ordered him to the passenger's side of the car.  He then entered the driver's side while Stewart entered the rear seat.  Magee then gave the gun to Stewart who placed the gun against the victim's head and demanded his money.  The victim gave him $10.00.  Magee drove the car to Compton when the victim escaped from the car around the 900 block of North Tajanta Street.  The victim notified the police of the incident and Magee was arrested by Los Angeles Sheriff's Department on March 26, 1963, while driving the victim's car.  The previous information is contained in the Probation Officer's Report (POR) of June 11, 1963, pages 3 & 4.

2.  **Prisoner's Version**:  Magee had nothing to say about his crimes to this writer; however, it was noted in the POR that Magee claimed to have just been trying to get even with the victim over a dispute which revolved around a female.  He stated that he did have a gun during the incident, but that it was retrieved from the victim's vehicle and that the victim had no knowledge of it.  He further stated that the car was pushed from the location where the victim escaped as the victim had taken the keys from the ignition.

3   **Aggravated Circumstances**:

a.  The crime involved the use of a weapon (Firearm).

b.  The crime involved the robbery of another individual.

c.  The prisoner had just paroled from prison for a previous violent crime.

MAGEE, Ruchell            A-92051          PBSP          SUBSEQUENT HEARING
OCTOBER 1994                                                    6-22-94 KJ:rl

COPY TO INMATE
VIA CCI

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION HEARING
OCTOBER 1994 CALENDAR
PAGE TWO

A-92051

MAGEE, Ruchell

    4.   <u>Mitigating Circumstances</u>:  None.

B.   <u>Multiple Crime</u>:  Kidnapping (PC 209) Count 1, Case #56168, Santa Clara County.  Sentence: Life.  Victims: Harold Haley, age unknown, Gary Thomas, age unknown and three unidentified female victims.

    1.   <u>Offense Summary</u>:  On August 7, 1970, Magee and a William Christmas were transported to Marin County Courthouse under the pretext of testifying in the criminal trial of another San Quentin inmate, James McClain.  During the course of the trial, a Jonathon Jackson stopped the trial by displaying a handgun in the courtroom. He gave the gun to McClain who pointed it at Haley and stated that if anyone moved he would kill the judge.  Magee stepped down from the witness stand to have the bailiff remove his handcuffs while Jackson approached the bench with a briefcase which contained a number of items including, tape, coiled wire and what appeared to be sticks of dynamite taped together.  McClain began to tape a sawed off shotgun around Haley's neck.  The group subsequently left the courtroom with Haley, Thomas and three unidentified female jurors wired together around the waist as hostages.  Once in the courthouse hallway, they systematically removed all weapons from the deputies on duty.  They continued to keep the shotgun around Haley's neck.  They exited the court house and climbed into a yellow van with Jackson and McClain entering the front and remaining individuals entering through the rear door. They drove the van toward the South Arch where they approached a road block that had been set up near Civic Center and the intersection of the road they were on. The stopped approximately 30 yards from the road-block when they spotted a correctional officer behind the car next to them.  The correctional officer was fired at by McClain who was subsequently shot in the hand by the officer with a rifle.  At that point, it appeared that Magee pulled the trigger on the shotgun that was around Haley's neck and his right side of his head was blown away.  Thomas grabbed the pistol from McClain's hand and shot Jackson, McClain, Christmas, and Magee before being shot from an unknown source.  As a result of the occurrence, Haley, McClain, Jackson, and Christmas were

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION HEARING
OCTOBER 1994 CALENDAR
PAGE THREE

A-92051

MAGEE, Ruchell

1.  **Offense Summary:**  (Continued)  dead.  Thomas was permanently paralyzed, and one unidentified female juror was shot.

2.  **Prisoner's Version:**  Magee refused to discuss his crime with this writer.  It was noted that he pled guilty to the offense of Kidnapping as a result of a plea bargain wherein the Murder charge was dropped.

3.  **Aggravated Circumstances:**

    a.  The crime involved the loss of several human lives.

    b.  The crime indicated premeditation and planning.

    c.  The prisoner was incarcerated at the time of the crime.

    d.  The crime resulted in the permanent injury to an individual.

    e.  The crime involved a high degree of callousness.

    f.  The prisoner expresses no remorse for the crime.

    g.  The crime involved the use of several weapons (not proven in court).

4.  **Mitigating Circumstances:**  None.

C.  **Multiple Crime:**  Robbery 1st (PC 211) Count 1, Use of a Deadly Weapon.  Case #272227, Los Angeles County.  Victim: Ben Howard, age unknown.

    1.  **Offense Summary:**  During the commission of Magee's initial Life Crime, he committed Armed Robbery as described.

    2.  **Prisoner's Version:**  Magee refused to discuss his crime with this writer.  It was noted that he denied any robbery on his POR pages 5 & 6.

MAGEE, Ruchell          A-92051          PBSP          SUBSEQUENT HEARING
OCTOBER 1994                                            6-22-94 KJ:rl

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION HEARING
OCTOBER 1994 CALENDAR
PAGE FOUR

MAGEE, Ruchell                                                    A-92051

II.  **Pre-conviction Factors**:

   A.  **Juvenile Record**:   Magee was arrested and convicted of an
       Attempted Rape at the age of sixteen.  He served approximately
       six years and seven months of a twelve year sentence for the
       crime at Louisiana State Prison in Angola.

   B.  **Adult Convictions**:  Magee arrested as an adult on the instant
       offenses only.   The preceding information was obtained from
       his POR and CI&I Rap Sheets.

   C.  **Personal Factors**:   Magee claims to be an only child born to
       Elemer Magee.   This is a result of a liaison between Elemer
       Magee and his father Walter Lewis.   It appears that Magee
       never knew his biological father and that he received little
       discipline growing up.  He attended school but never finished
       as a result of his incarceration at the age of sixteen.   He
       moved to California after being released from prison in 1962
       to reside with an aunt.  He had a sporadic employment history
       of menial jobs.   He was unemployed at the time of his
       commitment offense.  He has never served in the military.  He
       is of below-average intelligence but appears to be in good
       physical health.  He has had episodes of questionable mental
       status; however, he refused to receive a psychological or
       psychiatric intervention.  He has been uncooperative regarding
       psychiatric evaluations in the past.  He has remained single
       throughout his incarceration and has never fathered any
       children.  He has claimed a variety of religious affiliations
       but has not indicated any religious preference.  He has no
       known chemical dependencies, but experimented with marijuana
       and alcohol on the streets.

III. **Post Conviction Factors**:

   A.  **Overall Prison Adjustment:**   A synopsis of Magee's progress
       during his incarceration is unproductive.  He has received
       several serious disciplinary reports during his incarceration.
       In  addition,  he  received  his  second  Life  term  while
       incarcerated.   He  has  failed  to  enhance  his  personal
       development by remaining in the Security Housing Unit (SHU)
       since  1970.   He  has  written  several  letters  to  various
       individuals threatening their lives.  He repeatedly refused
       any attempts at psychological or self-help intervention.

MAGEE, Ruchell           A-92051        PBSP        SUBSEQUENT HEARING
OCTOBER 1994                                          6-22-94 KJ:rl

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION HEARING
OCTOBER 1994 CALENDAR
PAGE FIVE

A-92051

MAGEE, Ruchell

B.  He last appeared before the Board of Prison Terms on
May 20, 1992. His parole was denied for two years. The board
made the following recommendations:  1) Remain disciplinary
free;  2) Work towards reducing custody level to allow for
programming opportunities;  3) Upgrade vocationally and
academically;  4) Participate in self-help programs; and 5)
Cooperate with clinicians and staff.

C.  Disciplinary Problems:  As a result of continuing disciplinary
behavior (Threatening Public Officials) Magee has been placed
in the Security Housing Unit on indeterminate status.

D.  Accomplishments in Programs:  Subject's placement in the
Security Housing Unit for disciplinary concerns have precluded
him from participating in programs.

E.  Relationships with Staff and Inmates:  Subject has not been a
management concern to staff and is relatively quiet.

F.  Mental or Medical Problems:  During this period of
incarceration, Subject has not required nor received any
psychiatric mental evaluations. Additionally, Magee has been
uncooperative with clinicians for routine psychiatric
evaluations.

IV.  Future Plans:  Magee refused to discuss his case; therefore, no
further plans were obtained.  He appears to have no work skills
which would benefit him on the outside.  It further appears that he
has no family or community support.  He has indicated, in the past,
a desire to return to Louisiana; however, it is unknown if he
currently has any family ties remaining there that would help
support him.  He does not currently have any holds or warrants;
however, several notices are indicated.

V.  Summary:

A.  Considering the commitment offenses, prior record, and prison
adjustment, it is the belief of this writer that he would pose
a high risk to the public if released from prison at this
time.

B.  Prior to release, Magee would benefit from reducing his
custody so that he would be able to participate in educational
or vocational programs.  He would further benefit from

MAGEE, Ruchell          A-92051          PBSP          SUBSEQUENT HEARING
OCTOBER 1994                                            6-22-94 KJ:rl

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION HEARING
OCTOBER 1994 CALENDAR
PAGE SIX

MAGEE, Ruchell                                              A-92051

    participation in self-help therapy program to deal with his feeling of persecution and racism. He should become and remain disciplinary free. His incarceration in prison has been unproductive for him and he appears to be in need of substantial change in his life.

C.  This report is based on a detailed review of the C-File, a 30 minute interview with Magee, and periodic contacts with Magee over the past two years. He was afforded the opportunity to review his C-File prior to his BPT appearance.


K. JONES
CORRECTIONAL COUNSELOR I


K. TODD
CORRECTIONAL COUNSELOR II

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION HEARING
MARCH 1992 CALENDAR

A-92051

\GEE, Ruchell

I.  **Commitment Factors**:

A.  **Life Crime**:  Kidnapping for the purpose of Robbery (209 PC),
Use of a Deadly Weapon, Count 2, Case #272227, Los Angeles
County:  Sentence:  Life.  Victim:  Ben Howard, age unknown.

1.  **Offense Summary**:  On March 23, 1963 at approximately 2:00
p.m., the victim, Ben Howard, was seated in his car
outside the Tropicana Club at Manchester and San Pedro
Streets when the prisoner and the co-defendant, Leroy
Stewart, approached the car.  Magee pointed a gun at the
victim and ordered him to the passenger's side of the
car.  He then entered the driver's side while Stewart
entered the rear seat.  Magee then gave the gun to
Stewart who placed the gun against the victim's head and
demanded his money.  The victim gave him $10.00.  Magee
drove the car to Compton where the victim escaped from
the car around the 900 Block of North Tajanta Street.
The victim notified the police of the incident and Magee
was arrested by Los Angeles Sheriff's Department on March
26, 1963 while driving the victim's car.  The previous
information is contained in the Probation Officer's
Report (POR) of June 11, 1963, pages 3 & 4.

2.  **Prisoner's Version**:  Magee had nothing to say about his
crimes to this writer; however, it was noted in the POR
that Magee claimed to have just been trying to get even
with the victim over a dispute which revolved around a
female.  He stated that he did have a gun during the
incident, but that it was retrieved from the victim's
vehicle and that the victim had no knowledge of it.  He
further stated that the car was pushed from the location
where the victim escaped as the victim had taken the keys
from the ignition.

3.  **Aggravated Circumstances**:

a.  The crime involved the use of a weapon. (Firearm)

b.  The crime involved the robbery of another
individual.

c.  The prisoner had just paroled from prison for a
previous violent crime.

MAGEE, Ruchell        A-92051        PBSP        SUBSEQUENT HEARING
MARCH 1992                                        1-24-92 rl

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE HEARING
MARCH 1992 CALENDAR
PAGE TWO

A-92051

MAGEE, Ruchell

4. <u>Mitigating Circumstances</u>:  None.

B. <u>Multiple Crime</u>:  Kidnapping (209 PC) Count 1, Case #56168,
Santa Clara County.  Sentence: Life.  MEPD: 1-23-82.
Victims: Harold Haley, age unknown, Gary Thomas, age unknown
and three unidentified female victims.

1. <u>Offense Summary</u>:  On August 7, 1970, Magee and a William
Christmas were transported to Marin County Courthouse
under the pretext of testifying in the criminal trial of
another San Quentin inmate, James McClain.  During the
course of the trial, a Johnathon Jackson stopped the
trial by displaying a handgun in the courtroom.  He gave
the gun to McClain who pointed it at Haley and stated
that if anyone moved he would kill the judge.  Magee
stepped down from the witness stand to have the bailiff
remove his handcuffs while Jackson removed an automatic
rifle from his coat.  Jackson approached the bench with a
briefcase which contained a number of items including,
tape, coiled wire and what appeared to be sticks of
dynamite taped together.  McClain began to tape a sawed
off shotgun around Haley's neck.  The group subsequently
left the court room with Haley, Thomas and three
unidentified female jurors wired together around the
waist, as hostages.  Once in the courthouse hallway, they
systematically removed all weapons from the deputies on
duty.  They continued to keep the shotgun around Haley's
neck.  They exited the court house and climbed into a
yellow van with Jackson and McClain entering the front
and remaining individuals entering through the rear door.
They drove the van toward the South Arch where they
approached a roadblock that had been set up near Civic
Center and the intersection of the road they were on.
They stopped approximately 30 yards from the roadblock
when they spotted a correctional officer behind a car
next to them.  The Correctional Officer was fired at by
McClain who was subsequently shot in the hand by that
officer with a rifle.  At that point, it appeared that
Magee pulled the trigger on the shotgun that was around
Haley's neck and his right side of his head was blown
away.  Thomas grabbed the pistol from McClain's hand and
shot Jackson, McClain, Christmas and Magee before being
shot from an unknown source.  As a result of the
occurrence, Haley, McClain, Jackson and Christmas were

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE HEARING
MARCH 1992 CALENDAR
PAGE THREE

A-92051

MAGEE, Ruchell

1. **Offense Summary**: (continued)

   dead. Thomas was permanently paralyzed, and one unidentified female juror was shot.

2. **Prisoner's Version**: Magee refused to discuss his crime with this writer. It was noted that he pled guilty to the offense of Kidnapping as a result of a plea bargain wherein the Murder charge was dropped.

3. **Aggravating Circumstances**:

   a. The crime involved the loss of several human lives.

   b. The crime indicated premeditation and planning.

   c. The prisoner was incarcerated at the time of the crime.

   d. The crime resulted in the permanent injury to an individual.

   e. The crime involved a high degree of callousness.

   f. The prisoner expresses no remorse for the crime.

   g. The crime involved the use of several weapons (not proven in court).

4. **Mitigating Circumstances**: None.

C. **Multiple Crime**: Robbery 1st (211 PC) Count 1, Case #272227, Los Angeles County. Victim: Ben Howard, age unknown, Use of a Deadly Weapon.

   1. **Offense Summary**: During the commission of Magee's initial Life Crime, he committed Armed Robbery as described.

   2. **Prisoner's Version**: Magee refused to discuss his crime with this writer. It was noted that he denied any Robbery on his POR pages 5 & 6.

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE HEARING
MARCH 1992 CALENDAR
PAGE FOUR

A-92051

MAGEE, Ruchell

## I. Preconviction Factors:

A. **Juvenile Record**: Magee was arrested and convicted of an Attempted Rape at the age of sixteen. He served approximately six years and seven months of a twelve year sentence for the crime at Louisiana State Prison in Angola.

B. **Adult Convictions**: Magee appears to have been arrested as an adult on the instant offenses only. The preceding information was obtained from his POR and CII Rap Sheets.

C. **Personal Factors**: Magee claims to be an only child born to Elemer Magee. This is a result of a liaison between Elemer Magee and his father Walter Lewis. It appears that Magee never knew his biological father and that he received little discipline growing up. He attended school but never finished as a result of his incarceration at the age of sixteen. He moved to California after being released from prison in 1962 to reside with an aunt. He had a sporadic employment history of menial jobs. He was unemployed at the time of his commitment. He has never served in the military.

He is of below average intelligence but appears to be in good physical health. He has had episodes of questionable mental status; however, he refused to receive a psychological or psychiatric intervention. He has been uncooperative regarding psychiatric evaluations for a lengthy period of time.

He has remained single throughout his incarceration and has never fathered any children. He has claimed a variety of religious affiliations but does not appear to be devoted to any one type seriously. He has no known chemical dependencies, but experimented with marijuana and alcohol when on the streets.

## III. Post Conviction Factors:

A. A synopsis of Magee's progress during his incarceration is unproductive. He has received several serious disciplinary reports during his incarceration. In addition, he received his second Life term while incarcerated. He has failed to enhance his personal development by remaining in the Security Housing Unit since 1970. He has written several letters to various individuals threatening their lives. He repeatedly

MAGEE, Ruchell        A-92051        PBSP        SUBSEQUENT HEARING
MARCH 1992                                                1-24-92 rl

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE HEARING
MARCH 1992 CALENDAR
PAGE FIVE

A-92051

MAGEE, Ruchell

III. Post Conviction Factors: (continued)

refused any attempts at psychological or self-help
intervention. He last appeared before the Board of Prison
Terms on June 21, 1990.

B.  Magee appeared before the Board of Prison Terms on June 21,
1990 while housed at California State Prison Corcoran, at
which time parole was denied two years. At that time the
Board made the following recommendations: 1) Become and remain
disciplinary free; 2) Work towards reducing custody level so
that program opportunities will become available; 3)
Participate in self-help/therapy programs; and 4) Cooperate
with clinicians and staff and/or psychiatric council in an
evaluation which can be used at the next BPT Hearing.

IV. Future Plans:

Magee refused to discuss his case; therefore, no further plans were
obtained. He appears to have no work skills which would benefit
him on the outside. It further appears that he has no family or
community support. He has indicated, in the past, a desire to
return to Louisiana; however, it is unknown if he currently has any
family ties remaining there that would help support him. He does
not currently have any holds or warrants; however, several notices
are indicated for a variety of individuals.

V. Summary:

A.  Considering the commitment offenses, prior record and prison
adjustment, it is the belief of this writer that he would pose
a high risk to the public if released from prison at this
time.

B.  Prior to release, Magee would benefit from reducing his
custody so that he would be able to participate in educational
or vocational programs. He would further benefit from
participation in a self-help therapy program to deal with his
feelings of persecution and racism. He should become and
remain disciplinary free. His incarceration in prison has
been unproductive for him and he appears to be in need of
substantial change in his life prior to parole.

MAGEE, Ruchell          A-92051          PBSP          SUBSEQUENT HEARING
MARCH 1992                                                      1-24-92 rl

FE PRISONER EVALUATION
JBSEQUENT PAROLE HEARING
\RCH 1992 CALENDAR
\GE SIX

AGEE, Ruchell                                                    A-92051

V. <u>Summary</u>: (continued)

   C.   This Board Report was based on eight (8) hours of Central File
       review, five (5) minutes of interview and several contacts
       with Magee during normal casework contact.


_____
). PERKINS
CORRECTIONAL COUNSELOR I



_____
3. ATER
CORRECTIONAL COUNSELOR II



MAGEE, Ruchell              A-92051         PBSP         SUBSEQUENT HEARING
MARCH 1992                                                  1-24-92 rl

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION
HEARING FOR MARCH 1990

A-92051

MAGEE, RUCHELL

I.    COMMITMENT FACTORS:

A.    Life Crime:

Kidnapping for robbery with a prior felony conviction
(Los Angeles Co., Case # 272227).  Victim; Ben Howard,
age unknown.

1.    Facts of this offense are reflected in the Board
of Prison Terms transcripts dated 2/24/83, page 3.

B.    Prisoner's Version:

Inmate MaGee refused to participate in an interview for
the preparation of this report.  Note:  He has
previously maintained his innocence in this case.  His
feelings on the matter are well documented in his
numerous letters contained in his central file.

C.    Aggravating and Mitigating Circumstances:

1.    MaGee was on parole from Louisiana at the time he
committed the kidnapping offense.

2.    He was armed with a firearm during the commission
of the crime.

3.    His prior conviction was also a violent crime.

4.    No circumstances of mitigation are noted.

II.    PRE-CONVICTION FACTORS:

Documents from the previous hearing have been considered and
that information remains valid.

III.    POST CONVICTION FACTORS:

Documents from the previous hearing have been considered and
the information remains valid.  During the period of time
since then, the prisoner's behavior has remained the same.
The Board of Prison Terms last considered this case on
3/23/88 at which time parole was denied for an additional 2

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION
HEARING FOR MARCH 1990
PAGE 2

year period.  At that time, the panel recommended that Magee
become disciplinary free, and work towards reducing his
custody level so that program opportunities will become
available.  Subject has not met the Boards recommendations
as of this date.  See attached Post Conviction Progress
Report for details.

IV.     FUTURE PLANS:

Future plans are unknown at this time, as Magee is unwilling
to participate in an interview in the preparation of this
report.

V.      SUMMARY:

A.    Considering the commitment offense, prior record and
prison adjustment, the writer believes the prisoner
would probably pose a high degree of threat to the
public at this time, if released from prison.

B.    Prior to release, the prisoner could benefit from
remaining disciplinary free, participating in a
psychiatric evaluation, and reducing his custody level
enabling him to participate in program activities.

C.    This Board report is based upon two hours of research
of MaGee's central file.  Note; Subject has refused to
participate in an interview for the preparation of this
report.

Prepared by:                        Reviewed by:

R. VALDEZ,                           S. MARSHALL,
Correctional Counselor I             Correctional Counselor II

L. SMALL,                            D.D. Penson    C&PR (a)
Program Administrator                C&PR

MAGEE, RUCHELL          A-92051          CSP/COR          3/90 CAL          DB/vf

STATE OF CALIFORNIA

FE PRISONER: POSTCONVIC PROGRESS REPORT

| DOCUMENTATION HEARING

| PAROLE CONSIDERATION HEARING

| PROGRESS HEARING

**STRUCTIONS**
TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 2-05-92 o 8-30-92 | | | **PLACEMENT:**  Remained at PBSP-SHU on Indeterminate status.  **CUSTODY:**  Max A"R".  **VOCATIONAL TRAINING:**  No participation due to placement in SHU.  **ACADEMICS:**  No participation due to placement in SHU.  **WORK RECORD:**  No participation due to placement in SHU.  **GROUP ACTIVITIES:**  No participation due to placement in SHU.  **PSYCHIATRIC TREATMENT:**  None.  **PRISON BEHAVIOR:**  Received CDC 115 on 3-3-92 for Threatening a Public Official.  Received CDC 115 on 3-13-92 for Threatening Staff.  **OTHER:**  No laudatory chronos. |
| 8-31-92 'o 8-30-93 | | | **PLACEMENT:**  Remained at PBSP-SHU on indeterminate status.  **CUSTODY:**  Max A"R".  **VOCATIONAL TRAINING:**  No participation due to placement in SHU.  **ACADEMICS:**  No participation due to placement in SHU.  **WORK RECORD:**  No participation due to placement in SHU.  **GROUP ACTIVITIES:**  No participation due to placement in SHU.  **PSYCHIATRIC TREATMENT:**  None.  **PRISON BEHAVIOR:**  No disciplinaries received this period.  **OTHER:**  No laudatory chronos received this period. |
| )8-31-93 To )6-10-94 | | | **PLACEMENT:**  Remained at PBSP-SHU on indeterminate status.  **CUSTODY:** Max A"R".  **VOCATIONAL TRAINING:**  No participation due to placement in SHU.  **ACADEMICS:**  No participation due to placement in SHU.  **WORK RECORD:**  No participation due to placement in SHU.  **GROUP ACTIVITIES:**  No participation due to placement in SHU.  **PSYCHIATRIC TREATMENT:**  None.  **PRISON BEHAVIOR:**  No disciplinaries received this period.  **OTHER:**  No laudatory chronos received this period. |

CORRECTIONAL COUNSELOR SIGNATURE   DN Sayer/4 R

DATE  7-14-94

CCI K. B. JONES

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| MAGEE, Ruchell | A-92051 | PBSP | 10/94 | |

BPT 1004 REV 7-86

PAGE 1 of ___1___

6-22-94 KJ/rl



$02.360
08/19/2008
Mailed From 93212
US POSTAGE

Hasler

CORCORAN STATE PRISON

Robert Grave Mace

Office of Clerk
U. S. District Court
Northern District
450 Golden Gate Ave.
San Francisco, CA 94102

~ Legal Mail ~